**Mary Ann (Clifton) GRISSOM,**
**Plaintiff/Appellant,**

v.

**METROPOLITAN GOVERNMENT OF NASHVILLE, DAVIDSON COUNTY, Tennessee, Ronald Hickman, in his individual and official capacities, Phillip Hedgepath, in his individual and official capacities, John Doe, an as yet unnamed official and/or employee of the Metropolitan Government of Nashville, Davidson County, Tennessee, Defendants/Appellees.**

Court of Appeals of Tennessee,
Middle Section, at Nashville.

May 1, 1991.

Permission to Appeal Denied by
Supreme Court Sept. 23, 1991.

Patrick D. O'Rourke, Mary Frances Lyle, Nashville, for plaintiff/appellant.

Susan Short Jones, Director of Law, Wm. Michael Safley, Metropolitan Dept. of Law, Nashville, for defendant/appellee Metropolitan Government.

Larry H. Snedeker, John E. Rodgers, Sr., Nashville, for defendant/appellee Ronald Hickman.

## OPINION

KOCH, Judge.

This appeal involves a sexual harassment claim against the manager of a city golf course. A golf course employee filed suit in the Chancery Court for Davidson County against the manager and the Metropolitan Government of Nashville and Davidson County, alleging that the manager had treated her inappropriately after she rebuffed his sexual advances. A jury returned a verdict for the defendants after the manager testified that he and the employee had been involved in an eleven-year office romance. The employee has appealed, challenging the trial court's instructions and the factual foundation for the jury's verdict. We affirm the judgment.

### I.

Mary Ann Clifton, now Grissom, went to work as a cashier's clerk at the Two Rivers Golf Course in May, 1976. She was thirty-three years old and had two children. Her fourteen-year marriage had ended approximately one year earlier because of her bouts with depression and because of her sexual dysfunction due, at least in part, to sexual abuse she claimed to have suffered as a child.

Mr. Ronald Hickman managed the Two Rivers course when Mrs. Grissom went to work there. He was married and had four children. The first six months of Mrs. Grissom's employment passed without incident. However in November, 1976, Mrs. Grissom and Mr. Hickman had their first sexual encounter. Their accounts of this incident are strikingly different. Mrs. Grissom asserts that Mr. Hickman raped her on the floor of the women's bathroom one evening after the course had closed for the day. Mr. Hickman, on the other hand, states that they engaged in consensual sexual intercourse after they happened to

brush up against each other in the golf course's cramped office.

Mrs. Grissom told no one about the incident for eleven years and continued working at the golf course with Mr. Hickman. After this dispute arose, she insisted that the November, 1976 incident was the only time Mr. Hickman had sexual intercourse with her and that she did not complain about it at the time because she feared that she would lose her job and that people would think she was a "whore." Mr. Hickman, however, stated that the November, 1976 incident was the beginning of an eleven-year liaison with Mrs. Grissom that continued uninterrupted through her second marriage and stopped in 1987 only after Mrs. Grissom decided to marry for the third time.

Mr. Hickman testified that he and Mrs. Grissom frequently had sexual intercourse in the office after the golf course closed for the day. He explained that he would usually initiate these encounters but that Mrs. Grissom would initiate them on occasion. He also stated that he and Mrs. Grissom customarily patted, pinched, and embraced each other during the work day and that Mrs. Grissom welcomed and reciprocated his sexual advances.

None of the persons who worked at the golf course between 1976 and 1987 ever observed Mr. Hickman and Mrs. Grissom engaging in sexual conduct. However, one employee described several incidents in 1984—around the time of Mrs. Grissom's divorce from her second husband—when Mrs. Grissom exposed herself and invited him to fondle and kiss her breasts. He stated that these episodes occurred in the golf course's office at closing time when no one else was around.

All the golf course employees who testified at trial, except Mrs. Grissom, stated that the work environment at the golf course was good. They described an informal, pleasant atmosphere where everyone got along. No one remembered any occasion when Mr. Hickman treated Mrs. Grissom inappropriately, and everyone stated that Mr. Hickman and Mrs. Grissom appeared to be good friends.

Mr. Hickman went on paid leave to use up his compensatory time from late 1986 until early 1987. When he returned in March, 1987, his relationship with Mrs. Grissom continued much as it had before except that they did not engage in sexual intercourse. He stated that they continued to hold hands, to pat and pinch each other, to kiss, and to engage in "sex talk."

While Mr. Hickman was on leave, Mrs. Grissom had become involved with Joe Grissom whom she had met at the golf course several years earlier. Mr. Grissom and Mrs. Grissom became engaged in April, 1987 and began having sexual relations at that time. Sometime in April or May, Mrs. Grissom told Mr. Hickman that she and Mr. Grissom were engaged.

Mr. Hickman insists that he did not treat Mrs. Grissom differently after she told him about her engagement to Mr. Grissom. Believing that they could still "say anything to one another," he made comments to her "in jest" about no longer needing the couch in the office and about picking on her because she was letting someone else "get in her pants." He also insists that he meant nothing by these remarks and that Mrs. Grissom did not seem to object to them.

However, Mr. Hickman also noticed a change in Mrs. Grissom's attitude around this time. She began to cry and to become emotional whenever he talked with her. He thought she was acting like she had "her feelings up on her shoulders" and that she was taking everything he said and did the wrong way. He denied picking at her or requiring her to do a disproportionate share of the work.

In mid-May, Mrs. Grissom told her fiancé that Mr. Hickman had been making sexually suggestive statements to her and that he had told her that "there is nothing wrong with your work, it is just that you won't drop your pants for me, but you will for others." Mr. Grissom suggested that she report Mr. Hickman to his superiors.

After Memorial Day, Mrs. Grissom told Katherine Allen that Mr. Hickman was "treating her more harshly because she

wouldn't have sexual relations with him" and that Mr. Hickman had exposed himself to her. Ms. Allen immediately took Mrs. Grissom to Tommy Lynch, the assistant director of Board of Parks and Recreation. Mrs. Grissom repeated her complaint to Mr. Lynch who promised to look into the matter. Mrs. Grissom did not tell either Ms. Allen or Mr. Lynch that Mr. Hickman had raped her in 1976.

Mr. Lynch questioned Mr. Hickman shortly after talking with Mrs. Grissom. Mr. Hickman readily conceded that he had made suggestive comments to Mrs. Grissom during April and May, 1987. However, he asserted that his comments had been "in jest" and that Mrs. Grissom should have known that he did not mean anything by them. He did not tell Mr. Lynch that he and Mrs. Grissom had been having sex since 1976. Mr. Hickman agreed to stop making suggestive comments to Mrs. Grissom and to refrain from retaliating against her for reporting him.

Mr. Lynch decided that Mrs. Grissom should not be required to continue to work with Mr. Hickman and, therefore, that Mr. Hickman should be transferred to another golf course. He discussed the idea with all concerned. Both Mrs. Grissom and Mr. Hickman appeared to accept this solution.

Mrs. Grissom was hospitalized on June 12, 1987, after suffering a severe psychotic episode. Two days later, a newspaper article appeared stating that Mr. Hickman had been transferred and would become the manager of another golf course. Mrs. Grissom's emotional reaction to the article prompted Mr. Grissom to wonder whether she had been having an affair with Mr. Hickman. When he asked Mrs. Grissom about her relationship with Mr. Hickman, Mrs. Grissom told him for the first time that Mr. Hickman had raped her in 1976.

Mr. Grissom immediately informed Mr. Lynch of these new allegations, and Mrs. Grissom gave Mr. Lynch the names of employees who, she claimed, could corroborate her complaints. When Mr. Lynch confronted Mr. Hickman with this information, Mr. Hickman denied raping Mrs. Grissom in 1976 and revealed that he and Mrs. Grissom had been having consensual sexual intercourse in the golf course office off and on since 1976.

Mr. Lynch also interviewed the other golf course employees named by Mrs. Grissom. None of the employees corroborated Mrs. Grissom's story. To the contrary, each employee insisted that Mr. Hickman had never mistreated them and that they had never seen him mistreat anyone else. They also told Mr. Lynch that Mr. Hickman had been a good supervisor and that they had enjoyed a good relationship with him.

Mrs. Grissom decided that she was no longer satisfied with Mr. Lynch's decision to transfer Mr. Hickman to another golf course because the action did not seem to be punitive enough. While still hospitalized, she demanded that Mr. Lynch conduct a "departmental hearing" into the matter. Mr. Lynch declined to take further action and informed Mrs. Grissom of her right to prefer charges against Mr. Hickman before the Civil Service Commission.

Mrs. Grissom returned to work at the golf course following her release from the hospital. Later, she applied for the manager's position that opened up following Mr. Hickman's transfer. She did not receive the job but remained at the golf course as the assistant manager. Mrs. Grissom married Mr. Grissom in October, 1987 and filed this suit in February, 1988.

## II.

The primary focus of Mrs. Grissom's appeal is the evidentiary support for the jury's verdict. She insists that the verdict cannot stand because the record contains overwhelming evidence of Mr. Hickman's unwelcomed sexual advances from March though May, 1987. We do not share Mrs. Grissom's view of the evidence.

## A.

Mrs. Grissom's entire case is premised on her assertion that Mr. Hickman's unwelcome sexual advances created a hostile work environment that interfered with her job performance and caused her to have a series of severe psychotic episodes begin-

ning in June, 1987. She claims that Mr. Hickman raped her in November, 1976 and that for the next eleven years she silently endured his repeated threats to rape her again as well as his repeated sexual advances that took the form of touching, patting, and pinching. She also asserts that the harassment escalated in 1987 when she told Mr. Hickman that she planned to marry her present husband.

Mr. Hickman's defense went to the heart of Mrs. Grissom's claim that his sexual advances were unwelcome. He denied the rape accusations and asserted that he and Mrs. Grissom had been carrying on a consensual sexual relationship since 1976. He stated that Mrs. Grissom had been a willing sexual partner and that she had welcomed his sexual advances and, in fact, had even made advances of her own. He also stated that their sexual activities diminished but did not cease after Mrs. Grissom became engaged.

The jury was required to reconcile these conflicting versions of the relationship. After hearing fifteen witnesses during three days of trial, they found specifically that Mrs. Grissom had not proved by a preponderance of the evidence that Mr. Hickman had engaged in sexual harassment that effected the terms and conditions of Mrs. Grissom's employment. The trial court approved the verdict by denying Mrs. Grissom's motion for a judgment notwithstanding the verdict and for a new trial.

### B.

■ Mrs. Grissom first challenges the denial of her motion for a judgment notwithstanding the verdict. We need not reach the merits of this issue because the motion was procedurally defective. Mrs.

Grissom failed to seek a directed verdict at the close of all the evidence.

Tenn.R.Civ.P. 50.02 provides, in part, that

> Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal question raised by the motion. Within 30 days after the entry of judgment a party who had moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have a judgment entered in accordance with his motion for directed verdict.

Under this rule, only parties who have moved for a directed verdict at the close of all evidence may seek a motion for a judgment notwithstanding the verdict. *Potter v. Tucker*, 688 S.W.2d 833, 835 (Tenn.Ct. App.1985).

Mrs. Grissom moved for a directed verdict at the close of her case in chief.[1] She did not, however, renew her motion at the close of all the evidence. Accordingly, her post-trial motion for a judgment notwithstanding the verdict was ineffectual.[2]

### C.

Mrs. Grissom also asserts that the trial court should have granted her a new trial because there was no material evidence to support the jury's finding that Mr. Hickman had not sexually harassed her. The evidence does not support this claim.

■ Reconciling apparently conflicting testimony and evaluating the witnesses' credibility are, in the first instance, the jury's responsibilities. *Main St. Transfer and Storage Co. v. Smith*, 166 Tenn. 482, 486, 63 S.W.2d 665, 666 (1933); *Kinney v.*

---

1. This motion was untimely and improper. Tenn.R.Civ.P. 50.01 does not permit a plaintiff to move for a directed verdict at the close of its own case in chief.

2. Were we to reach the merits of this issue, we would still affirm the trial court's denial of the motion. Courts do not reweigh the evidence or re-evaluate the witnesses' credibility when they rule on a Tenn.R.Civ.P. 50 motion. *Holmes v.*

*Wilson*, 551 S.W.2d 682, 685 (Tenn.1977); *Grady v. Bryant*, 506 S.W.2d 159, 163 (Tenn.Ct.App. 1973). They view the evidence in the light most favorable to the motion's opponent and grant the motion only when the evidence can reasonably support but one conclusion. *Crosslin v. Alsup*, 594 S.W.2d 379, 380 (Tenn.1989); *Holmes v. Wilson*, 551 S.W.2d at 685. Viewing the evidence in the defendants' favor, there was ample evidence to take this case to the jury.

*Yazoo & M.V. R.R.,* 116 Tenn. 450, 453, 92 S.W. 1116, 1116 (1906); *Clark v. Engelberg,* 58 Tenn.App. 721, 731, 436 S.W.2d 465, 470 (1968). The trial courts must also perform these tasks when a motion for new trial requires them to review the evidence as the "thirteenth juror." *Davis v. Mitchell,* 27 Tenn.App. 182, 205, 178 S.W.2d 889, 898 (1944); *Haire v. Smith,* 5 Tenn.Civ. App. 304, 314 (1914).

 Appellate courts do not have the same ability to reconcile conflicting testimony or to evaluate credibility because they do not have the opportunity to observe the witnesses while they are testifying. *See Cumberland Tel. & Tel. Co. v. Smithwick,* 112 Tenn. 463, 468–69, 79 S.W. 803, 804 (1904); *Tennessee Coal and Railroad Co. v. Roddy,* 85 Tenn. 400, 403, 5 S.W. 286, 288 (1887). Accordingly, we do not reweigh the evidence and we do not re-evaluate the witnesses' credibility on appeal from a jury verdict. *Truan v. Smith,* 578 S.W.2d 73, 74 (Tenn.1979). Instead, we give the jury verdict great weight, *Karas v. Thorne,* 531 S.W.2d 315, 317 (Tenn.Ct. App.1975), and we will not set a verdict aside unless there is no material evidence to support it. Tenn.R.App.P. 13(d); *Electric Power Bd. v. St. Joseph Valley Structural Steel Corp.,* 691 S.W.2d 522, 526 (Tenn.1985); *Cary v. Arrowsmith,* 777 S.W.2d 8, 23 (Tenn.Ct.App.1989).

Sexual harassment cases, by their very nature, require the finders of fact to reconcile conflicting testimony by evaluating the witnesses' credibility. *Meritor Savs. Bank, FSB v. Vinson,* 477 U.S. 57, 68, 106 S.Ct. 2399, 2406, 91 L.Ed.2d 49 (1986). This case is no exception.

 The jury was called upon to decide whether Mr. Hickman created a hostile work environment for Mrs. Grissom by making unwelcome sexual advances. Mrs. Grissom claimed that she suffered an emotional breakdown after enduring Mr. Hickman's sexual advances for eleven years. Mr. Hickman, on the other hand, claimed that he and Mrs. Grissom had been carrying on an affair for eleven years and that her breakdowns were the result of her pre-existing psychiatric problems.

The jury clearly believed Mr. Hickman and decided that his sexual advances, both before and after March, 1987, were welcomed and that they did not create a hostile work environment for Mrs. Grissom. The credibility of Mrs. Grissom's account of her relationship with Mr. Hickman between November, 1976 and March, 1987 undermined the credibility of her account of their relationship after March, 1987.

In an effort to circumvent her credibility problems, Mrs. Grissom argues that she is entitled to a new trial based on Mr. Hickman's and Dr. Georgina A. Abisellan's testimony alone. Under her view of the proof, Mr. Hickman admitted making unwelcome sexual advances beginning in March, 1987, and these advances were the sole proximate cause of her psychotic episodes. We do not agree with Mrs. Grissom's view of this proof.

While Mr. Hickman admitted making sexual advances after March, 1987, he did not concede that the advances were unwelcome. In fact, he asserted that he behaved no differently toward Mrs. Grissom after March, 1987 than he did before and that his conduct was what he had become accustomed to over the last eleven years. He categorically denied that Mrs. Grissom ever rebuffed him or ever told him that his advances were unwelcome.

Several witnesses, including Mr. Hickman, testified that Mrs. Grissom's conduct became erratic and emotional in May, 1987. While Dr. Abisellan stated that the conduct was "triggered" by Mr. Hickman's actions, she also stated that it was caused by the psychological disorders Mrs. Grissom had suffered since childhood. Dr. Abisellan gave no opinion concerning whether Mr. Hickman's conduct was unwelcome or whether Mrs. Grissom's psychotic episodes could have been brought on by her efforts to reconcile her simultaneous relationships with Mr. Hickman and Mr. Grissom.

Decisions in cases of this sort must be determined in light of the record as a whole. *Meritor Savs. Bank, FSB v. Vinson,* 477 U.S. at 69, 106 S.Ct. at 2406. In our view, the record contains material evi-

dence upon which the jury could reasonably have concluded that Mr. Hickman did not make unwelcome sexual advances toward Mrs. Grissom and that his conduct did not create a hostile work environment for her.

Even though we have affirmed the jury's verdict and the trial court's denial of Mrs. Grissom's motion for new trial, our decision should not be construed as approval of Mr. Hickman's conduct. In fact, we find his conduct toward Mrs. Grissom and his failure to appreciate the impropriety of having sexual relations with a subordinate to be offensive. However, the factual measuring stick on appeal is found not in our personal sensibilities but rather in Tenn. R.App.P. 13(d). Our decision, simply put, is that the record contains material evidence to support the jury's conclusion that Mrs. Grissom did not prove by a preponderance of the evidence that she was a victim of sexual harassment.

### III.

As a final matter, Mrs. Grissom asserts that the jury instructions with regard to her burden of proof did not distinguish adequately between her own work environment and the environment of the work place as a whole. As a result, she argues that the jury's deliberations were based on the mistaken understanding that they could not find that Mr. Hickman had sexually harassed her unless they found that his sexual advances towards her disrupted the entire work place. We do not read the trial court's instructions so narrowly.

The trial court is the jury's sole source for the legal principles to guide their deliberations. *State ex rel. Myers v. Brown*, 209 Tenn. 141, 148–49, 351 S.W.2d 385, 388 (1961). Thus, trial courts must give accurate instructions with respect to the parties' respective theories, *Street v. Calvert*, 541 S.W.2d 576, 584 (Tenn.1976), and must frame the instructions in plain words that average jurors will understand. *Gross v. Nashville Gas Co.*, 608 S.W.2d 860, 872 (Tenn.Ct.App.1980); *Martin v.*

*CastnerKnott Dry Goods Co.*, 27 Tenn. App. 421, 431, 181 S.W.2d 638, 642 (1944).

We do not measure jury instructions against the standard of perfection. *Davis v. Wilson*, 522 S.W.2d 872, 884 (Tenn.Ct. App.1974). Instead, we review the entire charge just as the jury would, *Memphis St. Ry. v. Wilson*, 108 Tenn. 618, 620, 69 S.W. 265, 265 (1901); *Abbott v. American Honda Motor Co.*, 682 S.W.2d 206, 209 (Tenn. Ct.App.1984), and we will not invalidate it as long as it fairly defines the legal issues involved in the case and does not mislead the jury. *Smith v. Parker*, 213 Tenn. 147, 156, 373 S.W.2d 205, 209 (1963); *Railroad Co. v. Spence*, 93 Tenn. 173, 187, 23 S.W. 211, 215 (1893).

The trial court's instructions in this case did not impose upon Mrs. Grissom the burden of proving that Mr. Hickman's conduct towards her caused a hostile environment in the entire work place. The trial court specifically instructed the jury that

[T]he plaintiff must prove that the charge of sexual harassment had the effect of unreasonably interfering with her work performance and created an intimidating, hostile or offensive working environment that effected [sic] seriously the psychological well being of the plaintiff.

When read as a whole, we find that the trial court's instructions were adequate and that they fairly submitted the legal issues in the case to the jury.

### IV.

We affirm the judgment and remand the case to the trial court. We also tax the costs of this appeal to Mary Ann Grissom and her surety for which execution, if necessary, may issue.

TODD, P.J., and LEWIS, J., concur.